Julius Mendelson and Pearl Mendelson, His Wife v. Commissioner.
Mendelson v. Commissioner
Docket No. 86213.
United States Tax Court
T.C. Memo 1961-319; 1961 Tax Ct. Memo LEXIS 30; 20 T.C.M. (CCH) 1653; T.C.M. (RIA) 61319; November 22, 1961
*30 Andrew F. Slaby, Esq., and Sydney M. Eisenberg, Esq., 1131 W. State St., Milwaukee, Wis., for the petitioners. William J. Wise, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in the income tax of the petitioners and additions to tax for negligence for the indicated years as follows: Addition to tax
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
1957
$638.43
$31.92
1958
870.24
43.51
The issues for determination are the correctness of the respondent's action (1) in determining the amount of income received by petitioner Pearl Mendelson as tips during 1957 and 1958, and (2) in determining that the petitioners were liable for an addition to tax under section 6653(a) of the Internal Revenue Code of 1954 for negligence for both years. Findings of Fact Some of the facts have been stipulated and are so found. The petitioners Julius and Pearl Mendelson, residing in Milwaukee, Wisconsin, timely filed their joint Federal income tax returns for 1957 and 1958 with the district director in that city. Petitioner Pearl Mendelson, sometimes *31 hereinafter referred to as the petitioner, was employed as a part-time waitress by the El Dorado Restaurant, Wauwatosa, Wisconsin, in 1957 and 1958. On the joint income tax returns of the petitioners there were reported wages received from El Dorado of $1,172.76 and $1,345.95 respectively. On the return for 1957, $200 was reported as income received by petitioner as tips as a waitress. No amount was reported on the return for 1958 as income received as tips. The El Dorado Restaurant is an attractive restaurant located near the intersection of Highway 100 and Bluemound Road in Wauwatosa, a suburb of Milwaukee, Wisconsin. Its interior of modern decor, consists of a lower level and an upper level with a low ceiling and accessible only by a flight of stairs consisting of approximately 15 to 20 steps. The upper level is used to seat the overflow from the lower level and occasionally for parties. During 1957 and 1958 El Dorado operated a bar, specialized in drinks, steaks, and seafood and served lunch and dinner meals. It served a lunch for $1.15, served steak and seafood dinners ranging in price from $2.75 to $5.50, and featured a New York Strip Sirloin dinner at $5.25. El Dorado was *32 open for business 7 days a week. In 1957 and 1958 the petitioner worked only when called by the regular hostess at El Dorado during those years. Each time petitioner came to work she was assigned a station of four or five tables at which to serve, and she served food and liquor at that station. The petitioner had to set up and clean up her station and the other waitresses set up and cleaned up theirs. The petitioner did about the same amount of work in this regard as the other waitresses. When petitioner worked the noon shift, she would report for work around 11 a.m. and set up her station. Customers would start coming in about noon and she would wait on tables until about 1:30 or 2 p.m. Then she would clean up her station, check out, and go home. A similar procedure was followed for the evening meal. All of the waitresses at El Dorado during 1957 and 1958 were good waitresses and petitioner was an average waitress within the group. All of the waitresses were rotated to the various stations and spent approximately the same amount of time at each during those years. The petitioner was not assigned to a station in the upper level any more frequently than any of the other waitresses. *33 "Dead" or nonserving hours at El Dorado were the period from about 2 to 5 p.m. The petitioner rarely worked that shift since she generally was called in to work during serving hours. The tipping custom at El Dorado ranged from nothing in some instances to more than 15 percent of the customer's check in other instances, depending on the quality of service and the quality of the food. There was less tipping by customers served in the upper level than by customers served in the lower level. During the baseball season El Dorado served large groups of baseball fans whose expenditures for food were nominal and their tipping also was nominal. In some instances customers, after being served, evaded the waitress and left without tipping or paying their checks. The employment arrangement in effect at El Dorado in 1957 and 1958 was that waitresses were to give 10 percent of their tips to the hostess and 10 percent to the bus boy. Under the arrangement if a waitress received no tips, the hostess and bus boy received nothing from her. Under the foregoing arrangement the petitioner made payments of undisclosed total amounts during 1957 and 1958. On some occasions the regularly employed hostess *34 performed the duties only of a waitress and on other occasions she performed the duties of both hostess and waitress. On occasions some of the waitresses were assigned to duty as hostess. Also, on occasions, some of the waitresses were assigned to duty in the restaurant's checkroom. When a waitress was assigned to checkroom duty, she was paid the wage of a checkroom employee and was permitted to retain an undisclosed but small percentage of tips she received. The remainder of the tips was turned over to the management of the restaurant. The rates of pay at El Dorado in 1957 and 1958 were as follows: Hostess
$1.50 per hour
Hostess-waitress
1.00 per hour
Checkroom
1.00 per hour
Waitress
.70 to.75 per hour
The petitioner maintained no books or records respecting the time she worked at El Dorado, the capacity or capacities in which she served, the amount of food and liquor served by her or the amount received by her as tips during 1957 and 1958. During 1957 and 1958, 60 percent of El Dorado's liquor sales represented sales of liquor which was served at tables. The following is a statement of the total food and liquor sales, portion of liquor sales served *35 at tables, total hours of all waitresses, inclusive of services as hostess and in checkroom, total hours of all waitresses, exclusive of service as hostess and in checkroom, and total hours of petitioner with respect to El Dorado during 1957 and 1958: 1957
1958
Total food sales
$298,026
$301,039
Total liquor sales
130,440
128,330
Portion of liquor sales
served at tables
78,264
76,998
Total hours of all wait-
resses, inclusive of time
as hostess and in check-
room
23,082
23,155
Total hours of all wait-
resses, exclusive of time
as hostess and in check-
room
19,949
20,621
Total hours worked by pe-
titioner all of which were
as waitress
1,409
1,582
Upon making a survey of tipping customs in the Milwaukee area the respondent concluded that the usual custom was to tip a percentage of the food and liquor bill. About April or May 1959, when the respondent began an investigation of the petitioners' income tax liability for 1957 and 1958, guest checks showing the amount of food and liquor served by the individual waitresses at El Dorado during those years were not available. Because the petitioner had not maintained any book or records respecting *36 the amounts received by her as tips during the years in question and because of the unavailability of records showing the actual amount of the food and liquor served by petitioner during such years, the respondent concluded that the taxable amount of tips received by petitioner during the years in question should be determined in the following manner: First, ascertain the total of the total food sales and the sales of liquor served at tables during the respective years. Second, divide the totals for the respective years by the total number of hours worked by all waitresses as waitresses during the respective years to ascertain the average amount of food and liquor served per average waitress hour. Third, multiply the quotients thus obtained for the respective years by the number of hours the petitioner worked as waitress during such years to ascertain the total amount of food and liquor served by petitioner during each year. Finally, apply 12 percent to the total sales of food and liquor served by petitioner as thus ascertained so as to ascertain the amount of the petitioner's taxable tips for the respective years. In determining the foregoing amount of 12 percent, the respondent *37 concluded from his survey that a rate of 15 percent was properly applicable to the food and liquor sales served at tables at El Dorado. However, because the waitresses were required to pay a portion of their tips to the hostess and bus boy, the respondent determined 12 percent as a proper percentage to use in order to determine the taxable amount of tips received by petitioner during the respective years. Employing the foregoing method the respondent determined that during 1957 petitioner received taxable income from tips in the amount of $3,123 and during 1958 received taxable income from tips in the amount of $3,470. During 1957 and 1958 the petitioner received taxable income from tips in the amounts of $2,660 and $2,900, respectively. Opinion The petitioners contend that petitioner received no income from tips during 1957 in excess of the amount reported for that year, namely, $200, and that she received no income whatever from tips during 1958. On the other hand, the respondent contends that during the years 1957 and 1958 she received income as tips in at least the amounts of $3,123 and $3,470, respectively, the amounts determined by him. Dorothy L. Sutherland, 32 T.C. 862 (1959), *38 involved the income tax liability for 1953, 1954, and 1955 of a waitress who, like the petitioner here, did not keep any records of the income received by her as tips. There we pointed out that every taxpayer is required by law to report in his income tax return, fully and honestly, every item of gross income received, and must maintain adequate records of some kind which will show to him and to the Commissioner the amount of income of all types received in each year; that if the taxpayer does not keep any records to show the full amount of every kind of income received in a taxable year, or if such records as are kept do not clearly show the entire income, the Commissioner is authorized to make a computation of the amount of income in accordance with such method as in his opinion does clearly show the full amount of income received; that a computation of income so made by the Commissioner is presumptively correct under law and the taxpayer has the burden of proving that it is erroneous; and that such burden is not discharged by the taxpayer's estimates of income or his unsubstantiated, uncorroborated and self-serving testimony that the amounts reported in his return are correct. *39 The petitioner did not keep any record of the tips she received. Some of her testimony is to the effect that her tips during 1957 were actually less than the amount she reported on her income tax return for that year and that during 1958 she received no tips because she performed set-up and stocking work at El Dorado. Other of her testimony is to the effect that throughout 1957 and 1958 she was employed as a waitress and served food and liquor at tables as did other waitresses at El Dorado during those years. Other of her testimony is to the effect that every Sunday during 1958 she served in the restaurant's checkroom and that the full amount of all tips received on those days was turned over to the management. We are not able to find corroboration or substantiation in the record for her latter testimony. On the contrary, the time records maintained by El Dorado for its waitresses for 1957 and 1958, although showing that a number of its other waitresses on occasions worked in the checkroom, do not show that at any time during either of those years the petitioner worked in the checkroom. Further, other evidence shows that waitresses who worked in the checkroom were paid the wage of *40 a checkroom employee and were permitted to keep a small percentage of the tips they received. The petitioner makes no claim that she ever served as hostess and the time records of El Dorado contain no indication that she did. In view of the foregoing we have found that all of the time during which the petitioner worked at El Dorado in 1957 and 1958 was in the capacity of a waitress. The evidence shows that all of the waitresses employed at El Dorado during 1957 and 1958 were good waitresses and that of the group the petitioner was an average waitress and we have so found. We have set out in our findings the method employed by respondent in determining the taxable amount of the petitioner's income for the respective years from tips as disclosed by the evidence. As used by the respondent that method gives recognition to the fact that petitioner was an average waitress within her group in that it uses the average amount of food and liquor served by all waitresses per hour worked as waitresses during the respective taxable years as the basis for computing the amounts of food and liquor served by petitioner during such years and to which the respondent applied a rate of 12 percent to *41 ascertain the petitioner's taxable income received from tips for those years. Except as to the foregoing rate of 12 percent, we are of the opinion that the respondent's method as applied to the petitioner is fair and reasonable. In arriving at the rate of 12 percent to be applied to the amount of food and liquor sales served by the petitioner, the respondent concluded that a rate of 15 percent was properly applicable to the food and liquor sales served at the tables at El Dorado for the purpose of determining tips. Since the waitresses were required to pay a portion of their tips to the hostess and bus boy, the respondent reduced the 15 percent to 12 percent. The evidence as to tipping at El Dorado shows that tipping ranged from nothing to 15 percent of the customer's check for good service, and to more than 15 percent where the service was exceptionally good. The evidence further shows that there was less tipping by customers served in the upper level than by those served in the lower level and that tipping during the baseball season by large groups of baseball fans was nominal. There also is evidence that where a customer tipped 15 percent of his check when only food was served, *42 he tipped only 12 1/2 percent of his check when both food and liquor were served. Further, there is evidence that in some instances customers, after being served, evaded the waitresses and left without tipping or paying their checks and that in such instances the waitresses were required to pay the amount of the customers' checks. From our consideration of the foregoing we are of the opinion that an application of 10 percent, instead of 12 percent as applied by respondent, to the food and liquor sales served by petitioner during 1957 and 1958 will correctly approximate the taxable income received by petitioner in those years from tips. Accordingly we have found that during 1957 and 1958 the petitioner received taxable income from tips in the amounts of $2,660 and $2,900, respectively. As was said in Dorothy L. Sutherland, supra, taxpayers who receive income as tips but do not keep written records of the tips are "extremely negligent" in failing to keep such records. Since the petitioner did not keep any record of the tips she received during the years in question and since she received income from tips greatly in excess of the amounts reported in her returns for those *43 years, we sustain the respondent's determination of the additions to tax provided in section 6653(a) of the Code of 1954 for negligence. Decision will be entered under Rule 50.